UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL BROWN,

        Petitioner,

                                                        Case No. 04-10080

v.                                              Honorable David M. Lawson

KENNETH McKEE,

        Respondent.
_____/

## **OPINION AND ORDER CONDITIONALLY GRANTING PETITION FOR WRIT OF HABEAS CORPUS**

      This case is before the Court after remand by the Sixth Circuit to conduct an evidentiary hearing on Michael Brown's petition for writ of habeas corpus. Brown pleaded guilty in the Saginaw County, Michigan circuit court in 2002 to armed robbery with an agreement that his sentence would be "capped" at 14 years. It appears that everyone in the courtroom understood that the 14-year cap applied only to the minimum sentence under Michigan's indeterminate sentence law. Everyone, that is, except Brown himself. So after the judge imposed a sentence of 14 to 30 years, Brown concluded that "something ain't right," and he set about the process of trying to appeal his sentence. Initially, this Court found that under Michigan's indeterminate sentence law, the trial court did not violate the plea agreement. *Brown v. McKee*, 2007 WL 2421557, at *5 (E.D. Mich. Aug. 27, 2007). The court of appeals affirmed that finding. *Brown v. McKee*, 340 F. App'x 254, 256-57 (6th Cir. 2009). This Court also found that the petitioner's guilty plea was knowingly and voluntarily made. The court of appeals vacated that finding because it was not supported by the ambiguous record. Instead, that court found that "[t]he record supports a conclusion that Brown actually, and with good reason, understood the terms of the agreement to require that he receive

either a maximum sentence of fourteen years or an opportunity to withdraw the plea." *Brown*, 340 F. App'x at 257. Rather than ordering habeas relief, however, the court of appeals remanded for an evidentiary hearing, based on its belief that "the state may yet prove that Brown understood the nature of the plea's terms through evidence extrinsic to the transcript of the plea acceptance." *Id.* at 259. The Court has conducted that hearing, and the State did not establish that Brown was fully informed about his maximum sentence exposure. The Court it is convinced that Brown misunderstood that his guilty plea could be withdrawn if his *maximum* sentence exceeded 14 years, and that his understanding was reasonable under all of the circumstances. Therefore, the Court will order that the State either sentence Brown to a maximum sentence not to exceed 14 years, or allow him to withdraw his plea, and failing either of those two options, release him.

I.

On March 19, 2002, the petitioner pleaded guilty in Saginaw County, Michigan circuit court to armed robbery. During the plea colloquy, he also acknowledged being a habitual offender and that this crime was his fourth offense. Initially, the Court understood that Brown's prior crimes occurred in Michigan and inferred that he had an understanding of Michigan's indeterminate sentence law. But as the court of appeals pointed out, that was not accurate. Brown's prior crimes were committed in Illinois, which apparently has its own sentencing peculiarities.

Michigan uses an indeterminate sentencing scheme for custodial sentences in which the maximum sentence is set by the statute that defines the crime and the sentencing court sets a minimum term of imprisonment that may be as long as two-thirds of the statutory maximum sentence. *See* Mich. Comp. Laws § 769.34(2)(b); *People v. Babcock*, 469 Mich. 247, 255 n.7, 666 N.W.2d 231, 236 n.7 (2003) (citing *People v. Tanner*, 387 Mich. 683, 690, 199 N.W.2d 202 (1972)).

However, if the statutory maximum sentence is life in prison, as in the case of armed robbery, then the sentencing court has discretion to set the maximum term as well. *Babcock*, 469 Mich. at 256 n.7, 666 N.W.2d at 236 n.7. The Michigan parole board has the discretion to release a prisoner after he has served his minimum sentence. Mich. Comp. Laws § 791.233(1); *Hopkins v. Michigan Parole Bd.*, 237 Mich. App. 629, 646, 604 N.W.2d 686, 695 (1999).

Brown's armed robbery case came up for trial about 14 months after he was arrested. The court denied defense counsel's request to adjourn the case, recessed for lunch, and ordered counsel to return afterward to begin jury selection. Over the lunch break, the prosecutor and the defense lawyer negotiated an agreement to cap Brown's sentence in exchange for a guilty plea. The record shows that the prosecutor stated at the plea hearing that the mid-range for the sentencing guidelines was 175.5 months, which he had rounded down to fourteen years. He was referring to the prescribed minimum sentence, although the record does not say as much. He then said,

> It would have been about 14-1/2 years, and *we're going to cap any potential sentence for the defendant at 14 years.*
>
> I understand the Court does not have to follow that, but if the Court chose to sentence higher, then it would allow the defendant to withdraw his plea.

Plea Hr'g Tr. at 9 (Mar. 19, 2002) (emphasis added).

Defense counsel agreed, stating that in exchange for a plea of guilty to armed robbery and acknowledgment of the petitioner's habitual offender status,

> *the People are agreeing to recommend to the Court a cap of not more than 14 years*, this being roughly the mid-point of what was believed to be the appropriate guidelines in this case. That is a sentence bargain cap in this, the understanding being if the Court were to exceed that at the time of sentencing, Mr. Brown would have a right to withdraw his plea and proceed to a jury trial.

*Id.* at 10 (emphasis added).

The trial court subsequently engaged in a colloquy with the petitioner, who was then thirty-six years of age and had completed the eighth grade. The petitioner stated that he had discussed his plea with his attorney and that he was pleading guilty freely and voluntarily. *Id.* at 15. When the trial court asked the petitioner whether he understood that he was pleading guilty to a felony that carried a maximum penalty of life imprisonment or any term of years, the petitioner responded, "I pray to God I don't get it" and "I pray to God I don't receive that." *Id.* at 15. The court then asked, "But do you understand that that's what you're pleading guilty to?" *Ibid.* The petitioner responded, "Yes." *Ibid.*

The petitioner reassured the court that he understood the rights he was waiving by pleading guilty. Then the trial court said:

> Now it's my understanding, Mr. Brown, that the plea agreement that's been entered into between you and your attorney and the prosecutor's office in this case is the prosecutor is recommending that the Court sentence you to no more than 14 years in prison, *the maximum-minimum being no more than 14 years.* You understand that?

*Id.* at 18 (emphasis added). The petitioner answered, "Yes." *Id.* at 19.

The court explained that it was not required to follow the prosecutor's recommendation, but that the court would provide an opportunity for the petitioner to withdraw his plea if the court did not follow the prosecutor's recommendation. The petitioner said he understood and he was pleading guilty of his own choice. *Id.* at 19-20.

On June 6, 2002, the trial court sentenced the petitioner to imprisonment for a minimum term of fourteen years and a maximum term of thirty years. The court did not entertain comments from either side and adjourned the proceedings. The petitioner subsequently moved for re-sentencing on the ground that his plea was not voluntary or intelligently made. He claimed that the trial court did

not sentence him according to the plea agreement or permit him to withdraw his plea when the court imposed a sentence greater than the sentence agreed upon by the parties. The trial court denied the petitioner's motion after concluding that it had not diverged from the plea bargain. His appeals were denied by the state appellate courts.

This Court held an evidentiary hearing after remand on December 14, 2009. The state's one and only witness was William T. Street, who had represented the petitioner in his state court case. Street was appointed to represent Brown in January 2001, and concluded his representation 16 months later in June 2002, when the petitioner was sentenced. Street appeared to have a basic recollection of the case and the petitioner, but he relied heavily on his billing records for the details. He characterized the petitioner's case as "one of those . . . cases where the last thing you wanted was a contested jury trial" because the State "had a very solid factual case" and the defendant "was so high and so intoxicated at the time [of the crime] he had only a very fragmented recollection of what the events were." H'ng. Tr. at 14. Referring to the billing records that he kept in this case (introduced as exhibits in the hearing), Street was able to remember that he met with the petitioner at the jail a total of three or four times. *Id*. at 15.

Street recalled that he requested an adjournment of his client's sentencing on May 30, 2002, presumably, the original sentencing date, likely to go over the presentence report with the petitioner. *Id*. at 16-17. He also testified that after the petitioner received his sentence, the petitioner did not say anything remarkable to Street, save the commonplace thank-you-and-good-luck exchange. *Id*. at 18. The petitioner did not express any shock or outrage, nor did he have any questions for Street.

The State introduced as an exhibit a June 6, 2002 letter from the petitioner to the Clerk of the Court. In that letter, the petitioner wrote: "I do not wish to appeal my plea of guilty, but my sentence. For the fact, my sentence exceeds the upper limit of minimum sentence range. Furthermore, I believe the offense variable or prior record or records variable was improperly scored. I objected to the scoring at sentencing as I believe they should have been scored." *Id.* at 31-21. Street stated he had never seen the letter before.

Referring to his billing entry on March 1, 2001 (which read, "Prep/represent Defendant at prelim before Judge Thompson. Calculation of guidelines. Conference with Defendant. Conference with Piazza. Cross exam of witness. Videotape reviewed. Defendant bound over."), Street testified that it was "possible" that he shared with the petitioner his conversation with the prosecutor, Mr. Piazza, regarding the guidelines range. *Id.* at 22-23. Street conceded, however, that given the contested nature of the preliminary examination, "we were probably talking more about witnesses and the videotape and all of that stuff rather than what I thought his guideline range is going to be." *Id.* at 22.

Moving on to the billing entry on March 19, 2001 ("Represented Defendant at arraignment before Judge Borrello. Conference with Defendant at courthouse. Review of guidelines and H[abitual] O[ffender] A[ct] status. Conference with Piazza."), Street hypothesized it was "possible" he spoke with his client regarding his sentencing guidelines. Street conceded quickly, however, that "an arraignment is usually pretty cut and dry, enter a not guilty plea and out the door," and he did not have a specific recollection of speaking with his client regarding the guidelines on that occasion. *Id.* at 23-24.

Speaking about the billing entry on March 18, 2002 (which read, "Telephone calls to and from court. File review. Delivery of report to Prosecutor's office. PSI review. Trial prep."), Street explained that the reference to the "PSI," that is the presentence investigation report, was erronious (the PSI was not prepared at that time, since the plaintiff had not been convicted); rather, it should have referred to calculation of sentencing guidelines. *Id*. at 24-25. Street recalls discussing the sentencing guidelines with a different prosecuting attorney on that day (Mr. Borchard replaced Mr. Piazza). *Id*. at 25.

On several occasions following the petitioner's plea, Street placed phone calls to the organization called "Teen Challenge," at the request of his client. *Id*. at 26-27. The petitioner insisted that he underwent, as Street put it, "sort of a religious conversion," and he wanted Street to "try to get him sentenced into the Teen Challenge program rather than going into the institutional prison system." *Id*. at 26. Street continued to communicate with Teen Challenge, even after resetting the sentence on May 30, 2002. *Id*. at 27. The entry on June 4, 2001, for example, billed 1.5 hours for "Two telephone calls to Bridge, Teen Challenge. Jail Interview with Defendant regarding sentence." *Id*. at 27. Commenting on that entry, Street recalled that "there was a gentleman that showed up that day from Teen Challenge," with whom he spoke, and "[t]he rest would have been entirely my conversation with [the client] over in the jail going through the presentencing report and the likelihood that Judge Borrello was going to, in fact, sentence him into Teen Challenge as opposed to sentencing him into the State prison system." *Id*. at 28. According to Street, he advised the petitioner that, given his status as a fourth habitual offender, the likelihood of him being placed into the Teen Challenge program was "slim." *Ibid*.

Street described his conversation with his client regarding the potential sentence. When asked whether he advised his client as to what he was facing in terms of sentencing, Street responded:

> A. Fourteen years, yes.
> Q. You advised him just that he was facing, flat out, fourteen years?
> A. That was what had been negotiated in the case. That would be what was in the body of the presentence report. And that would have been part of what we talked about.
> Q. And did you communicate to him that fourteen years meant that would be his minimum sentence?
> A. Yes.
> Q. You did. And did you explain to him that -- or did you at all refer to the plea -- I guess the plea, if you didn't have the transcript the date of the plea -- where he was asked if he knew that he could face life in prison for what he pled guilty to?
> A. I don't recall that specifically coming up at that point in time. We had previously discussed Michigan's indeterminate sentencing law, that all inmates in Michigan get the maximum sentence at the top and plus a minimum sentence, and the minimum sentence is what the guidelines apply to.

*Id*. at 28-29.

Street clarified that the only time he discussed Michigan sentencing practices with the petitioner was during one of his initial meetings with the petitioner on February 13, 2001. During that discussion, which lasted eight tenths of an hour, Street also discussed with the petitioner the effect of the lineup results on the petitioner's trial strategy and the petitioner's prior convictions from Illinois; at that point, no plea deal was on the table. *Id*. at 40-41. And on the day of the plea, March 19, 2002, Street "doubt[ed] strongly that we would have [reviewed with Mr. Brown Michigan's sentencing practices.]" *Id*. at 41. Street confirmed that he does not have any recollection of his conversation with the petitioner on that day, apart from telling him that the prosecutor had finally come up with a number of fourteen. *Ibid*.

Street also explained that during these discussions, the petitioner was confused about how his Illinois convictions would translate into the Michigan sentencing system. The majority of Brown's experiences with the legal system took place in Illinois, where he spent most of his life. *Id*. at 29-30. Street stated that, apart from the conversation with Brown in jail on June 4, 2001, he does not recall specifically other conversations regarding the sentencing guidelines. *Id*. at 30. When prodded by the respondent's counsel, however, Street testified that according to his usual practice, he would have gone over the PSI with his client and would have made his client aware of the PSI guidelines range of 81 to 270 months. *Id*. at 30-31.

And later Street testified:

> Q. And did you . . . explain that [the sentencing range] only applied to your client's minimum sentence?
> A. I believe he very genuinely may not have understood what --
> Q. Not what you believe he meant. Did you explain that, that it only -- that those guideline calculations only applied to his minimum sentence?
> A. I don't believe it was ever specifically brought up that way. We had discussed Michigan's indeterminate sentencing pattern previously, but when we were going through the presentence report the day -- two days before he was going to go in for sentencing, we did not go back over all of that once again.
> Q. But you never specifically stated to him that fourteen years was the -- was the absolute most that he could receive?
> A. The absolute most?
> Q. The statutory maximum?
> A. No, I certainly would never have said that.
> Q. You never stated to Mr. Brown that the statutory maximum would have been fourteen years?
> A. The statutory maximum was life or any term of years.
> Q. Correct. And you explained that to Mr. Brown?
> A. It had been told to him several times, at every time that he was arraigned, even. He was aware that Michigan had both maximum sentences at the top and minimum sentences at the bottom.
> Q. And he was aware that there was also a statutory maximum set by law?
> A. Yes.

*Id*. at 34-35.

However, on cross-examination, Street clarified his views of the petitioner's potential misunderstanding as to what the 14-year cap applied to:

> Q. Mr. Shirvell was asking you, and I think you got a little interrupted, and I just wanted to hear your complete answer. You believe that Mr. Brown misunderstood . . . what the fourteen-year cap pertained to, correct?
> A. I believe that is a very real likelihood in this case.
> Q. And that's because you believe Mr. Brown could have misunderstood that the cap applied to his entire sentence and not only to his minimum sentence?
> A. That is correct. And the reason, again, kind of goes back to this intriguing conversation comparing Michigan to Illinois law. Apparently, in Illinois, a person in a felony case is given a single flat sentence, but if the Judge says twenty years, it really means ten. If the judge says ten, it really means five. That was an eye opener to me, but Mr. Brown seemed to be very familiar with Illinois practices where, apparently, what the Judge in the black robe says in the courtroom is exactly double the reality. I thought that was extremely strange and bizarre. He thought Michigan's practices everybody getting the maximum statutory mandatory sentence, plus then we dicker over the bottom end, was equally strange and alien to him, and that's why I believe there very well may have been some real genuine confusion in his mind as to what this fourteen-year cap actually applied to.

*Id*. at 41-42.

Street explained that on the date of the petitioner's plea hearing on March 19, 2002, he had several scheduling conflicts and was trying to adjourn the trial in the petitioner's case. *Id*. at 36. When the court denied Street's request and ordered him to be back in the courtroom after lunch recess to begin jury selection in Brown's case, he finalized a plea deal with the prosecutor over the lunch break and put the deal on the record after lunch. *Id*. at 37. According to Street's recollection, over the lunch break the prosecutor changed his mind and agreed to drop the minimum sentence to fourteen years, slightly below the midpoint of the applicable guidelines. *Id*. at 38.

Street admitted that his conversation with the petitioner on that day was brief. He "discussed with him the fact that the Prosecutor had finally at least given us a number and it was fourteen years rather than this whole potential range and that he, in fact, had gone a little bit below the midpoint

-10-

range." *Ibid*. Street stated that generally he avoids using the phrase "maximum minimum" because it is inherently ambiguous. *Id*. at 39.

The petitioner also testified at the hearing. He stated that he had a difficult childhood. His mother was an alcoholic and he had to fend for himself from a young age until his uncle and aunt stepped in. When his aunt passed away, the petitioner entered the foster care system and eventually "went to the streets." *Id*. at 67. He was convicted of several crimes under the Illinois law and became familiar with that state's legal system. He recalled that, under Illinois law, "if you was [sic] given ten years, it would be cut in half five years. Also, you would be given an opportunity on good behavior with good time credits and things like that there." *Id*. at 67.

Concerning his discussions with William Street, the petitioner remembered a conversation about the workings of the Michigan sentencing system fairly soon after he was arrested, but the discussion was limited. *Id*. at 68-69. He remembered Street mentioning that the two systems are vastly different — that "here you would get two numbers, like in Illinois where you would get a single number." *Id*. at 69.

On the day of the plea some 14 months later, the petitioner recalled that Mr. Street was in a rush that day and was trying to adjourn the case. *Id*. at 70. Judge Borrello, the state trial judge, denied his request and ordered the parties to reconvene for trial after lunch. The petitioner recalled having lunch in jail on that day. *Id.* at 71. He also remembered that when he returned from lunch, Street informed him that the prosecutor had come up with a fourteen-year cap. The petitioner took that promise to mean that he "would get nothing higher than fourteen years." *Ibid*. The petitioner explained:

> Q. What -- did you know that you could get two sentences, though?
> A. Yes.

-11-

> Q. So what did you think the two sentences would be?
> A. Well, he had -- he had mentioned about the 81 months, also, which was six years. So I saw that as the six years being the floor and the fourteen years being the ceiling and whatever I could get, it would be in between, like seven to eight or eight to ten, nine to twelve, but anything no higher than fourteen years, that's what I perceived it.
> . . .
> Q. What was your understanding about whether the Judge had to follow the recommended cap? Did you think the Judge had to follow the fourteen-year cap?
> A. Well, if he didn't, that I would have the right to withdraw my plea.
> Q. So you thought if he went above fourteen years you would have the right to withdraw your plea?
> A. Yes.

*Id*. at 72.

According to the petitioner, during his ten- or fifteen-minute meeting with Street, Street advised him that the plea was in his best interest because the case was a "floater" — i.e., "it carried any number of years to life." *Id*. at 73. Thinking that the plea capped his potential sentence at 14 years, the petitioner decided to take it. *Id*. at 73-74. When the prosecutor recited the terms of the plea in court, the petitioner took them to mean that "if the Judge sentenced me to anything higher [than fourteen years], . . . I would have the opportunity to step away from my plea." *Id*. at 75. Although the petitioner understood that the sentence was not a sure thing, he understood that his ability to withdraw the plea in case the sentence exceeded 14 years was certain. *Id*. at 75-76.

The petitioner denied that anyone told him that the Michigan sentencing guidelines were designed to generate a range for the minimum sentence only. *Id*. at 76. He clarified that, even though he knew judge *could* sentence him to life in prison, he thought that he could withdraw his guilty plea in that event. *Ibid*. The petitioner insisted that when judge told him, "the Prosecutor is recommending that the Court sentence you to no more than fourteen years in prison, the maximum minimum being no more than fourteen years," he understood the judge's words to mean that he

would "get no more than fourteen years in prison." *Id*. at 77. The petitioner never heard the phrase "maximum minimum" before his plea hearing, and he has never been sentenced for a felony under Michigan law or served time at a Michigan prison. *Id*. at 77-78, 80. He states he was "shocked" when he heard his sentence of fourteen to thirty years. *Id*. at 81. He explains that things were "moving so fast" following the imposition of his sentence that he was ushered out of the courtroom and did not have a chance to move to withdraw his plea. *Id*. at 82. He never said anything to his counsel because he was "bewildered" and "taken back"; nevertheless, he says he "gave [his attorney] a look that was like, wow, how did this happen, where did the ball drop at." Hr'g Tr.. at 85, 93. Immediately upon returning to jail, the petitioner tried to appeal his sentence and requested plea transcripts in a letter to the Clerk of the Court. *Id*. at 82; *see also* Def.'s Ex. 1, Pet. Letter to Clerk of the Court, June 6, 2002, at 2 ("I agreed to 6 yrs to 14 yrs with a cap, no 14 yrs to 30 yrs."). The petitioner also spoke to his sister, telling her "something ain't right here, . . . this is not what I pleaded to." *Id*. at 83.

During cross-examination about the discussion he and Street had over the PSI report, the petitioner recalled that Street never mentioned the terms "minimum guidelines," or "minimum sentencing range," but he could not recall the specifics of their conversation beyond that. *Id*. at 97. When confronted with his letter to the Clerk of the Court, in which he appealed "my sentence, for the fact my sentence exceeds the upper limit of *minimum sentence range*," the petitioner responded:

> Now, it is true, that is written, and it is true that I wrote this letter. Now, I don't know why I used those terms. I was confused, definitely, but I know what I meant. And if you would later go on, right up under that paragraph, I said, "I continue -- I agree to six years to fourteen years with a cap, not fourteen to thirty years." That's what I meant.

*Id*. at 98. The petitioner responded in a similar fashion to the respondent's counsel's inquiry about why the petitioner used the terms "offense variable," and "prior record or records variable," when he claims he was never explained the meaning of those terms: "I mean, I don't know. I don't know. But I do know one thing is that I agreed to six years to fourteen years with a cap, not fourteen to thirty years." *Ibid*.

Based on the evidence presented, the Court concludes that defense counsel never explained in terms that Brown understood the unique features of Michigan's indeterminate sentence law. Nor was any such explanation made on the record by the court or counsel. Brown's contention that he understood the plea bargain to include a "cap" of 14 years — that is, that no sentence would exceed that duration lest he be allowed to withdraw his plea — is credible and supported by the testimonial record. When Brown heard that the prosecutor agreed to allow him to withdraw his guilty plea if the sentence exceeded a 14-year "cap," Brown understandably believed that he would receive a sentence no greater than that unless he went to trial.

II.

Because the petitioner's habeas petition was filed after the passage of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), the AEDPA applies to his case. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997). The AEDPA contains the well-known provisions requiring deferential review of state court decisions applying federal constitutional law. 28 U.S.C. § 2254(d)(1)-(2); *Harrington v. Richter*, --- U.S. ---, 131 S. Ct. 770, 785-86 (2011) (holding that the AEDPA requires federal habeas courts to review state court decisions with "deference and latitude," and "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

the state court's decision" (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004))); *Peak v. Webb*, 673 F.3d 465, 472 (6th Cir. 2012) (stating that *Richter* holds that the review standard "is even more constricted than AEDPA's plain language already suggests"). However, in this case, the court of appeals found that the strictures of the AEDPA do not apply. *Brown*, 340 F. App'x at 257. The court stated:

> Because the state court did not decide the due process claim, we review this claim de novo. Although the district court regarded the state courts' decisions denying relief as implicitly holding that Brown's plea was knowing and voluntary, *see Brown*, 2007 WL 2421557, at *7, none of the state-court holdings addressed Brown's properly preserved due-process claim. AEDPA deference is therefore not applicable.

*Ibid.* (citing *Maples v. Stegall*, 340 F.3d 433, 436 (6th Cir. 2003)). The Sixth Circuit continues to adhere to that view, even after *Harrington v. Richter*, which held that "[w]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." *Harrington*, 131 S. Ct. at 784. *See Rayner v. Mills*, --- F.3d ---, ---, No. 10-5242, 2012 WL 2855803, *3-4 (6th Cir. July 12, 2012); *see also Davis v. Lafler*, 658 F.3d 525, 537 (6th Cir.2011) (en banc).

The law that applies in this case is clear and clearly established. When a guilty plea is not "voluntary and knowing, it has been obtained in violation of due process and is therefore void." *Boykin v. Alabama*, 395 U.S. 238, 243 n.5 (1969) (citing *McCarthy v. United States*, 394 U.S. 459, 466 (1969)). Because a guilty plea is a waiver of certain constitutional rights, it must be a voluntary, knowing, and intelligent act "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970). The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it." *Id.* at 749. For a guilty plea to be voluntary, "the defendant need only be aware of the direct consequences of

the plea" and "the maximum sentence that could be imposed." *King v. Dutton*, 17 F.3d 151, 153-54 (6th Cir. 1994). Affirmative misstatements of the maximum possible sentence can invalidate a guilty plea. *Pitts v. United States*, 763 F.2d 197, 201 (6th Cir. 1985); *see also Brown*, 340 F. App'x at 258.

Brown pleaded guilty under the mistaken understanding that if his maximum sentence exceeded 14 years, he would have the right to withdraw the plea and proceed to trial. The sentence he received exceeded his understanding of his maximum exposure, but his motion for resentencing was denied and he was not allowed to withdraw his guilty plea. The guilty plea was not knowing and voluntary because it was not "done with sufficient awareness of the relevant circumstances and likely consequences." *Brady*, 397 U.S. at 748. Therefore, the petitioner is in custody as a result of a conviction that violates a constitutional rule that has been clearly established by the Supreme Court, and he is entitled to habeas relief.

In *Hart v. Marion Correctional Institution*, 927 F.2d 256 (6th Cir. 1991), the court of appeals found a constitutional violation and granted a habeas writ when the petitioner pleaded guilty under mistaken information conveyed by the trial judge that understated his maximum sentence exposure. The remedy was to return the petitioner to state court for resentencing; but if he were "given any sentence beyond that which [he] believed to be the maximum when he pled guilty, he must be allowed to withdraw his plea. The State may then try him under the original indictment or release him." 927 F.2d at 259 (citations omitted). The court also has observed that "specific performance has been allowed where the defendant was only misled as to the length of his sentence." *Warner v. United States*, 975 F.2d 1207, 1214-15 (6th Cir. 1992). In this case, the petitioner was not guaranteed a specific sentence. Specific performance of the plea agreement can be achieved if the

State believes that a maximum sentence exceeding 14 years is appropriate and the petitioner is permitted to withdraw his guilty plea. The Sixth Circuit has held that such a remedy is appropriate in a case where the defendant pleaded guilty after having been misinformed about the length of his potential term of supervised release. *United States v. Reader*, 254 F. App'x 479, 482 (6th Cir. 2007) (stating that "'where the error involves the defendant's state of mind . . . the appropriate remedy is to vacate the plea and remand so that the defendant can plead anew' if he chooses, or proceed to trial" (citing *United States v. Tunning*, 69 F.3d 107, 115 (6th Cir. 1995))).

Based on these cases, the Court concludes that granting a conditional writ of habeas corpus is the proper course. The State should have the opportunity to impose a sentence for the armed robbery conviction consistent with the petitioner's understanding of the plea agreement. If the State chooses not to do that, the petitioner must be allowed to withdraw his guilty plea. If the State does neither, it must release the petitioner.

### III.

The petitioner is in state custody in violation of the Constitution. He is entitled to a conditional writ of habeas corpus.

Accordingly, it is **ORDERED** that the petition for a writ of habeas corpus is **CONDITIONALLY GRANTED**.

It is further **ORDERED** that the respondent shall release the petitioner from custody unless, within 70 days, the State resentences him to a maximum prison term that does not exceed 14 years or allows him to withdraw his guilty plea.

s/David M. Lawson  
DAVID M. LAWSON  
United States District Judge

Dated:   July 26, 2012

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 26, 2012.

s/Deborah R. Tofil  
DEBORAH R. TOFIL

---